Q. A. WIGHTMAN *alias* CHARLES W. CLAPP *et al.*

*v.*

JOHN A. HART.

1. ANSWER IN CHANCERY—*if sworn to can only be overcome by two witnesses.* When complainant requires the answer of defendant, under oath, and he so answers, it can only be overcome by the evidence of two witnesses, or by the evidence of one, and circumstances equal in weight to that of another.

2. PROMISSORY NOTES—*assignment prima facie bona fide.* When promissory notes have been assigned, the presumption will be indulged that it was for

value, and *bona fide.* Persons questioning the fairness of the transaction, to defeat the assignment, must prove that it was not for value, or that it was made for fraudulent purposes.

3. Insolvency of Holder—*not evidence of fraud.* Proof that the holder of a note was insolvent at the time the assignment was made does not prove the transfer to have been fraudulent. Nor does the fact that the assignor was the nephew of the assignee prove the transfer fraudulent.

Writ of Error to the Superior Court of Chicago.

This was a suit in chancery, commenced in the Superior Court of Chicago, in October, 1862, by John Hart, against Q. A. Wightman, *alias* Charles W. Clapp, Albert Clapp, Frederick Kaehler, Charles Kaehler, Frederick Johnson and Marion Blanchard.

The bill alleges that Charles W. Clapp, under the name of Wightman, and Edward Benton, as partners, became indebted to complainant. That complainant recovered a judgment, by attachment, against them, in the Superior Court of Chicago; but that it was without service of process, and without seizure of any property belonging to them, and consequently no execution could issue.

The bill alleges that Clapp absconded from Chicago in 1862, for the purpose of defrauding his creditors and complainant. That Benton was insolvent, and left Chicago, and joined the army about the same time.

That said C. W. Clapp, on the 16th of December, 1861, under the false name of Wightman, sold to Frederick Johnson, the schooner *Palmetto*, receiving in return ten notes of $200 each, secured by mortgage on said vessel.

That soon after, C. W. Clapp returned to Chicago secretly, and in disguise, and fraudulently, and without consideration, transferred said notes and mortgage to his brother, Albert Clapp, of Massachussetts, which notes are due and unpaid, and that Albert Clapp holds the same in trust for C. W. Clapp.

It further alleges, on information and belief, that Albert Clapp knew that his brother, C. W. Clapp, absconded from

Massachusetts, owing large amounts of money, for the purpose of delaying creditors, and charges that Albert Clapp knew C. W. Clapp assumed, at Chicago, the name of Wightman, for the purposes of fraud. That he knew C. W. Clapp absconded from Chicago December 16, 1861, owing money, and that said sale of said vessel was in contemplation of such absconding, and to defraud complainant; and knew such indebtedness was contracted under the name of Wightman. That previous to absconding from Chicago, C. W. Clapp, in January, 1862, sold the schooner *Argo* to Frederick Kaehler & Charles Kaehler, receiving therefor four notes of five hundred dollars each, dated January 18, 1862, and two of them secured by mortgage on said *Argo;* which notes were transferred at the same time, and under the same circumstances as the first named, to Albert Clapp, who holds them in trust for his brother, and are due and unpaid.

That, on information and belief, charges a secret agreement between Albert Clapp and his brother to re-assign said notes and mortgages.

Further, that in said attachment suit, garnishee process was served on Frederick Kaehler and Frederick Johnson, who, in answer to interrogatories, admitted the making of said notes and mortgages, and their readiness to pay, and that said notes and mortgages had been assigned to Albert Clapp, of which assignment they had notice.

That they attached to their answers the affidavit of Albert Clapp, falsely setting forth said assignment was made in good faith and for a valuable consideration, and that he does not hold them in trust for C. W. Clapp.

It alleges, that in consequence of the non-residence of Albert Clapp, a discovery of the true consideration of said assignment could not be had from him.

It alleges that C. W. Clapp has property which complainant is unable to reach, and that complainant is not in collusion with C. W. Clapp.

That Marvin Blanchard is the attorney for Albert Clapp and C. W. Clapp, and holds said notes and mortgages, and is

informed and advised of all the circumstances of said transfer to Albert Clapp.

It calls for the answers of the defendants, under oath.

It prays that defendants be decreed to pay said Hart said judgment, interest and costs, and the costs of this suit.

That so much of said notes and mortgages as is necessary be subjected to the payment of said judgment.

And prays that defendants be prohibited from paying or collecting said notes and mortgages, or selling, assigning or disposing of the same.

Prays that the assignment of said notes and mortgages, as against complainant, be decreed to be fraudulent and void; for other relief and for an injunction against the defendants.

The defendants answered the bill, and they severally admit, that complainant recovered the judgment in attachment against Wightman and Benton. That Kaehler and Johnson were garnisheed; and that they answered, admitting the execution of the mortgage; but denying any indebtedness to the defendants in that suit, or any property of defendant's in their hands. That Charles W. Clapp did business in Chicago, as charged. That he sold the vessels, and took notes and mortgages, as charged in the bill. And the answers of Albert Clapp and Blanchard set up that the notes were assigned to Albert Clapp, in payment of indebtedness by Charles to him of $3,500, owing before Charles left Massachusetts. That Charles' true name was Clapp, and not Wightman. They deny that Charles absconded from Massachusetts; and deny that he has any interest in the notes. That Albert Clapp only took the notes to obtain his pay. That only six of Johnson's notes and only two of Kaehler's were due when the judgment, in attachment, was recovered. They deny all fraud.

*Johnson* and *Kaehler* say they are uninformed whether Charles Clapp absconded from Massachusetts on account of his indebtedness. That they purchased the vessels in good

faith, and know of no fraud in the transaction; and say they are ready to pay the notes.

*Charles W. Clapp:* Admits in his answer that he left Massachusetts, and did business in Chicago in the name of Wightman, and in partnership with Benton. He denies that he absconded from Massachusetts, or was insolvent, or that the sale of the vessel was fraudulent or made to delay creditors; or that Albert holds the notes in trust for him; or that he is a brother of Albert Clapp; and says that he was owing Albert when he left Massachusetts for money loaned him, and on account, the sum of $3,000, as alleged by Albert in his answer.

Replications were filed to the answers of defendants.

*Luther Clapp* says: That he knew but little of Charles for thirteen years previous to that time; that he had no dealings with him, and knew nothing of the circumstances attending his leaving Massachusetts, but thought it was sudden; that he left one debt unpaid. He says he knows of no property of Albert Clapp.

*Peter Ham* testified: That he knew Charles, and that he, the day before he left, promised to pay or secure witness the next day; that he went to see him, but found he had left, and had no property there; that he owed witness $170, which was due; and he looked for property, but found none; witness knew him by the name of Wightman.

*Philip Scandlen* says: He was mate of the *Argo*, in employ of Wightman, and afterwards captain of the *Palmetto*. I settled with him and took his note, and released the vessel; he promised to pay, but never did.

*Peter Abraham* says: I was master of a vessel, and employed by Wightman; he gave me a deed to secure me for my services, and I discharged the vessel; he gave a note which was never paid.

*C. B. Southard* testified: Knew a man by the name of Wightman; saw him in Boston, also in Chicago.

*Mary Nagley:* Testified to Wightman's leaving Chicago, and he directed her that if any one inquired for him to say that he had gone East.

*J. Q. Hoyt:* Knew him as Wightman; was intimate with him; learned that his name was not Wightman, and spoke to him about it: he said he would explain, but never did.

*W. E. Johnson:* Knew Wightman in Massachusetts; that he met him in Chicago, and called him " Charley:" he said he did not go by that name, and did not want any one to hear witness call him by that name; he told witness that he had difficulty with his wife; that he had left her, and did not intend ever to live with her again; had failed in business, and owed some debts; that he had purchased the vessels; that they paid for themselves in 1860, and he had made $800. besides.    Witness knew Albert Clapp in Boston, and he was in the mercantile business at that place when witness left the East; says he enquired at Salem, but could hear of no property belonging to Charles W. Clapp.    This witness states that he was employed to go to Massachusetts to find witnesses as to Charles W. Clapp's being there, and his insolvency, and was paid seventy-five dollars for the service.

*H. W. Chamberland* says : He saw Benton at Camp Douglas in reference to purchasing a note on him and Wightman, and he advised me not to purchase, as Wightman was to pay it, and I would never get it.

*James L. Campbell* says : That he holds a note on Benton & Co. for $155; that he called on Benton for payment, when he said that he was worth nothing, and Wightman had taken all the money; had not been able to collect the note.

*B. F. Bayden* says: That Charles left Massachusetts in 1860, secretly, and in debt; that he absconded, owing witness $250 lent money; the day he left, he sent me a bill of sale from Newton, of his paint-mill and stock, with directions to sell it and pay myself, and pay overplus to his wife, also a note. The arrangement was, that I was to attach his property to prevent creditors from getting it, and save the surplus for

his wife. I knew Albert, and he came to me with a letter, requesting me to claim $650. When I read it, I asked what what to do, and he said see a lawyer, and follow his advice. I gave the note to his wife. I attached the property before he left.

*E. W. Fish* says : He knew Charles, and he left Waltham secretly, and thinks he was considered largely in debt. I had three writs to attach property. He settled one on his return. I attached all of his property, so far as I could find it, and sold it.

*B. F. Houton* says : He knew Charles in Waltham in 1859, but did not know when or how he left, or whether he was insolvent. I cannot say as to Albert's property, but he could or would not pay his bills. He owed me thirty dollars, and paid half of the amount. His reputation is, that he is insolvent. He may own property in Boston, and Salem, and I not know it, and might have loaned money.

*E. W. Wisewell* says : He knew Charles and Albert Clapp. Charles lived in Waltham in 1859. He was considered solvent up to the time he left. Albert bought an old factory, and cut it in two, and made two dwellings of it. He then worked at pianoforte making. Houghton and Albert had difficulty in settling.

*Silas Stone* says : He knows Albert, but is not acquainted with his condition as to property. He purchased a building and converted it into two dwellings, and afterwards traded one of them for a market shop in Boston.

*William P. Tenny* says : He knew Albert and Charles Clapp. The latter made white lead in 1859 and in 1860 in, Waltham. He left in the spring of 1860. Does not know whether he was considered good. I do not know whether he absconded. He owed me $1000. He promised to consign me white lead, but gave up the business, and did not consign it. When I first knew Albert, he was in Boston, in the provision business, and I suppose he had some means, and never heard of his being insolvent.

9

*Charles Chamberlain* says: He lives in Salem, and has known Albert ten years. He, at one time, owned a house in Salem worth about $1,700. Have heard of his owning property in Boston. I have never heard his credit questioned.

*William P. Tenny* says: My deposition has been taken at Boston. Albert was, so far as I knew, successful in business. Charles offered me fifty per cent. on my claim. When he left Massachusetts, I did not understand that he owed any one but me, and should think that he then had means to pay his debts.

*J. M. Comis* says: Charles Clapp boarded with him in Chicago; had no bad habits; and assumed name of Wightman on account of family difficulty, and to prevent his wife from finding him.

*P. E. Aldrich* says : He knew Charles in Worcester, Mass.

*Luther Clapp* says: He thinks Albert owned real estate most of the time for the last twenty years. He once owned land in Somerville, and traded it for a house in Boston. He owned a house in Salem, and we did business together. He has always been solvent, and is so at present. He sold his house in Salem for $1,700, and his half of the business for $400. He also owned the half of a team worth $300, and half of the bills. I know he loaned money.

A hearing was had in the court below, on the bill, answer, replications and proofs, and the court decreed:

That the assignment from Q. A. Wightman to Albert Clapp of the ten notes made by Frederick Johnson for two hundred dollars each, dated December 16th, 1861, secured by mortgage on the schooner *Palmetto*, and also two notes made by Frederick Kaehler and Charles Kaehler for $500 each secured by mortgage on the schooner *Argo*, bearing date January 18th 1862, is fraudulent and void.

That the injunction against said defendants, is made perpetual.

That Frederick P. Kaehler and Charles R. Kaehler, and Frederick Johnson pay to the clerk of this court, the principal and interest due on said notes up to the day of service of garnishee process on them.

That A. Clapp and M. Blanchard discharge said notes and mortgages and deliver them to the makers, and in default thereof the clerk shall deliver a copy of this decree to the makers which shall be a discharge of said notes, etc.

That the clerk shall pay to complainant on said judgment his *pro rata* portion of said moneys.

That complainant recover of C. W. Clapp and Albert Clapp his costs.

To reverse that decree, defendants bring the cause to this court by writ of error, and assign a number of errors :

1. The court erred in not dissolving the injunction on the motion of plaintiffs in error.

2. The court erred in rendering a final decree on the motion to dissolve the injunction before the cause was ready for hearing; without an order setting the cause down for hearing; or closing proofs, and without notice to the plaintiffs in error, or either of them, or their attorneys.

3. The court erred in making said injunction perpetual.

4. The court erred in perpetually enjoining the payment of $4,000 and interest due from Johnson and Kaehler to Albert Clapp and directing the sum of $3,000 to be paid to satisfy a claim of $1,523.

5. The court erred in decreeing the transfer of $3000 of said notes and mortgages to Albert Clapp fraudulent and void.

6. The court erred in decreeing the payment to John A. Hart of notes made by garnishees which were not due at the time judgment was rendered in said attachment suit.

7. The court erred in perpetually enjoining the payment of said ten notes made by Johnson, and said four notes made

by F. & C. Kaehler, amounting to $4000 and interest, and admitted to be due and owing by them, and held and owned by Albert Clapp, without making any disposition of the same.

8.   The court erred in not dissolving the injunction on the bill, answers and proofs, because the charges of fraud and secret trust are disproved.

9.   Because the equity of the bill was fully denied, and those denials in the several answers fully sustained by the proof.

10.   Because the complainant had a complete remedy at law.

11.   Because the judgment in favor of John A. Hart was not evidence of a debt, and was not a foundation for a bill in equity.

Messrs. Garrison & Blanchard for the plaintiffs in error.

1.   There is no prayer in the bill, nor facts in the case, authorizing or justifying a perpetual injunction, on the collection and payment of so great a sum as $4000; nor the appropriation of $3000, to satisfy a judgment of $1523, even if the same were a sufficient foundation for the bill.

2.   Judgment cannot be rendered against a garnishee, as the maker of a promissory note, until the same is due, (Scates' Comp., 232,) nor until after judgment is had against the defendant in the attachment, (sec. 15, p. 231 Scates' Com.)   A large portion of said notes were not due when the bill was filed, and judgment in favor of Hart was rendered, and some of them were not due when the decree was rendered.

3.   The decree, properly construed, deprives A. Clapp of the proceeds of said notes, and leaves such proceeds in the hands of garnishees, who admit they owe and are ready to pay the same to A. Clapp.

4.   The decree, properly construed, leaves almost the entire fund in controversy, in the hands of garnishees, who make no claim to the same.

5. The defendant in error had a complete remedy at law, and therefore has no right to come into a court of equity for relief. 3 Story's Equity, 996, 896; 3 Daniels' Ch. Pld. & Pr., 1840, 1841; *Abrams* v. *Camp*, 3 Scam, 291; *Born* v. *Staaden*, 24 Ill, 320; *Elston* v. *Blanchard*, 2 Scam, 420, 422; *Owens* v. *Ranstead*, 22 Ill., 161; *Albro* v. *Dayton*, 28 Ill, 329; *Stone* v. *Manning*, 2 Scam, 534; *Norton* v. *Woods*, 22 Wend, 522; *Duncan* v. *Lyon*, 3 Johns. Ch. R., 356; 2 Johns. Ch. R., 144, 296.

6. The judgment against W. & B., for want of personal service or seizure of property, is not evidence of a debt, and is not sufficient to authorize the bill. A creditor must establish his claim at law, before he can resort to equity. *Martyn* v. *Dryden*, 1 Gilm., 212; *Manchester* v. *McGee*, 4 Gilm., 520; *Greenway et al.* v. *Thomas*, 14 Ill., 271; *Buckmaster* v. *Carlin*, 3 Scam., 107, 383; *Eliott* v. *Piersol*, 1 Peters, 340; *Thompson* v. *Tolmie*, 2 Peters, 163, 169; *Voories* v. *U. S. Bank*, 10 Peters, 474; Story's Eq. Pl., 896, 898, 1897; *Hinman* v. *Ruchmore*, 27 Ill., 509.

Messrs. BATES & TOWSLEE for defendant in error.

1. The merits of the entire controversy were settled in the question of making the injunction perpetual; ordering the money into court, and the distribution, and the pleadings and proofs taken, all constituted the basis of such a decree. The prayer of this bill was for an injunction; that was granted. Defendants sought to dissolve it; complainants to perpetuate it, and the decree of the court was in accordance with the prayer of the bill, that it should be made perpetual; that the garnishee should be enjoined from paying the money to the fraudulent assignee.

2. Although the notes of the garnishees were not due, when the bill was filed, yet the rights of the complainants or the decree of the court, on hearing the motion to dissolve, could in no manner whatever be affected by that circumstance. The purpose of the bill was to set aside a

fraudulent assignment of the notes and chattel mortgages made by the garnishees to restrain their payment until the court should order them paid; and then to have payments made as the court should direct.

3. The order of the court making the injunction perpetual, was not erroneous, but was fully sustained by the facts developed in the evidence, and on the settled principles of equity and the practice of the courts thereof.

4. The evidence of the facts, showing the most outrageous frauds in the contracting of the debt due to complainants, by the defendant, Clapp, under the *alias* of Wightman; that the pretended debt due from him to his kinsman, for which he assigned this large amount of notes, and the chattel mortgages taken on the vessels, all establish to a demonstration that the whole transaction of Q. A. Wightman, *alias* C. W. Clapp, by which the debts due to complainants were contracted; his sale of his property, absconding from the State, and the pretended assignment of the notes and chattel mortgages, were all acts of the grossest fraud and downright villainy, carried on by the principal defendant, under an *alias* for a series of years; and culminating by his absconding from the State. On the principles of the case already cited, and the facts as adduced by the evidence, we claim that the decree was in accordance with the law and the evidence. The evidence is conclusive, that Albert Clapp was not a *bona fide* purchaser of these securities; that he had no means to purchase with; that he was a mere adjunct in the hands of his kinsman, Q. A. Wightman.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the court:

The bill alleges, that defendant in error, in the month of October, 1862, recovered a judgment against Q. A. Wightman and Edward Benton, in an attachment suit in the Superior Court of Chicago. But, inasmuch as there was no service

on the defendants, or levy on property, no execution could issue upon the judgment, against them. Also, that Wightman's real name was Charles W. Clapp, and that he and Benton had been engaged in the commission business in the city of Chicago, as partners, for about two years, before the commencement of the attachment suit. That in January, 1862, C. W. Clapp absconded, to defraud his creditors, and that Benton was insolvent and left the city about the same time. That C. W. Clapp, under the false name of Wightman, sold to one Johnson the schooner *Palmetto*, receiving therefor ten notes of $200 each, secured by a mortgage on the vessel.

That soon afterwards, C. W. Clapp returned secretly to Chicago, and fraudulently and without consideration transferred the notes and mortgage to Albert Clapp. That the notes are due and unpaid, and that Albert holds them in trust for Charles. That Albert knew his nephew had absconded from Massachusetts, owing large sums of money, for the purpose of delaying creditors, and that Albert also knew that Charles assumed the name of Wightman for fraudulent purposes. And that he knew that he absconded from Chicago owing money, and the sale of the vessel was in contemplation of so absconding, to defraud defendant in error.

That he also sold to F. & C. Kaehler the schooner *Argo*, receiving therefor five notes of five hundred dollars each, two of which were secured by mortgage on that vessel, which were transferred, under the same circumstances, to Albert Clapp, who holds them in trust for Charles. And charges a secret agreement that Albert will reassign the notes and mortgages to C. W. Clapp, and that these notes are due and unpaid.

It is further alleged, that in the attachment suit, garnishee process was served on F. Kaehler and Johnson, and that, to their answer, they attached an affidavit of Albert, stating that the assignment was made in good faith, and for a valuable consideration. That Blanchard, as attorney of Albert and C. W. Clapp, holds the notes, and is apprised of all the circumstances of the case. The bill requires answers under

oath. Prays that defendants be decreed to pay complainant his judgment, interest and costs, out of the notes; that the assignment be canceled, and that the Clapps be enjoined from collecting the notes.

Albert Clapp answered, admitting the sales of the vessels, the taking of the notes by Charles, and the recovery of the judgment in the attachment suit, as alleged. Also the assignment of the notes to him, but denies that it was fraudulent; and insists that it was done in good faith, and to secure *bona fide* indebtedness, due from Charles to him. Denies all fraud, and all the material allegations of the bill.

The question arises, whether the sworn answer of Albert Clapp has been overcome by the evidence of two witnesses, or that of one, and circumstances equal to the testimony of another. A careful examination of complainant's evidence shows that there is, we think, an entire want of direct or circumstancial evidence to show that the assignment was without consideration, or was fraudulent. Nor does it show that Albert Clapp was insolvent, or of such limited means that Charles could not have been indebted to him. On the contrary, some of complainants' witnesses speak of his having some property, and most of them say he was engaged in business on his own account, or for others, and none of them seem to know anything definitely of his means. On the other hand, his testimony shows that he had means. Some of his witnesses say he was successful in business, and that they never heard his solvency questioned. It also appears that he owned a house in Boston, and another in Salem, and loaned money. The assignment of the notes is *prima facie* evidence that a consideration was paid, and the complainants' evidence, we think, fails to overcome it, and the sworn answer, and defendant's evidence, which seems to support the transaction as fair.

It is true that the evidence shows that Charles W. Clapp left Massachussets in debt, and without the knowledge of his creditors. That he left Chicago in the same manner, and

and it may be reasonably inferred that he was insolvent at both places. But we are at a loss to perceive how this proves the transaction fraudulent, or that Albert Clapp, his uncle, had no claims against him. For aught that appears, the debt to his uncle may have been a portion of the debts that rendered him insolvent. Albert swears that he was indebted to him at the time, and to satisfy which, the assignment was made, and we find no positive evidence that it was not true, and we think the circumstances fail to show that he did not owe him. Nor does the fact, that Albert and Charles were relatives, prove fraud. It may be a circumstance to excite suspicion, but, of itself, is not proof, nor do we think, in connection with other circumstances, that it overcomes the sworn answer responsive to the allegations of the bill. The decree of the court below must, therefore, be reversed and the cause remanded.

*Decree reversed.*